680 So.2d 879 (1995)
Nathan D. SLATON
v.
STATE.
CR-89-848.
Court of Criminal Appeals of Alabama.
January 13, 1995.
Opinion Modifying Decision on Denial of Rehearing April 14, 1995.
*884 Oliver W. Loewy, Montgomery, for appellant.
James H. Evans, Atty. Gen., and Sandra Stewart, Asst. Atty. Gen., for appellee.

ON RETURN TO REMAND
MONTIEL, Judge.
On September 30, 1993, this Court remanded this cause to the trial court to determine whether the trial court's secretary was properly designated by the presiding circuit judge to excuse potential jurors, in compliance with this court's holding in Windsor v. State, [Ms. CR-91-1487, August 13, 1993] ___ So.2d ___ (Ala.Crim.App.1993) (Montiel and McMillan, JJ., dissenting). The trial court submitted its written findings of fact and conclusions of law to this court on December 15,1993.
Slaton argues that he was deprived of his right to a fair and impartial jury because the trial judge's secretary had excused prospective jurors from the venire. Slaton maintains that the trial court was not empowered to delegate the duty and responsibility of excusing potential jurors. In February, 1994, the Alabama Supreme Court reversed this court's judgment in Windsor, which held that, without having been designated by the circuit's presiding judge, a circuit clerk's practice of granting the legitimate excuses of potential jurors was reversible error. In overruling this court, the Supreme Court held that, even in the absence of a "formal delegation of power and a proper designation by the presiding judge," the circuit clerk and the circuit clerk's staff properly granted the legitimate excuses of prospective jurors, and what "[was] not a usurpation of legislative authority, but instead, [was] the natural result of an attempt to conform to the spirit, if not the letter, of the statutes." Windsor v. State, [Ms. 1930048, February 18, 1994] ___ So.2d ___, ___ (Ala.1994). See § 12-16-145, Code of Alabama 1975.
Furthermore, in this case, the judge's secretary had been designated to excuse potential jurors. In the trial court's written findings on remand, the court stated that as the presiding judge of the circuit, he had designated each of the judges' secretaries, who are confidential employees, "to excuse jurors at the time their judge is assigned the control of the jury."
Based on the Supreme Court's holding in Windsor, as well as because the trial court's secretary had been designated to excuse jurors for specific reasons, we hold that potential jurors were properly excused by the trial court's secretary. Slaton's rights to a fair and impartial jury and to a fair trial were not violated.
This court also remanded this case to the circuit court on an unrelated issue. We determined that the trial court erred when it considered Slaton's juvenile record in deciding that the mitigating circumstance of no prior criminal activity did not exist. Therefore, we remanded this case to the trial court for a determination of whether the trial court would have imposed the death sentence had it not considered Slaton's juvenile record.
We will address the issue of whether the trial court would have sentenced Slaton to death without consideration of his juvenile record later in this opinion. A rendition of the facts in this case is necessary before we can address the other issues Slaton raises on appeal.
Slaton was indicted for murder made capital because it was committed during the rape and intentional killing of Modenia Carrie Phillips. § 13A-5-40(a)(3), Code of Alabama 1975. The jury found the defendant guilty of capital murder and unanimously recommended that he be sentenced to death. The trial court accepted the jury's recommendation and sentenced the defendant to die in the electric chair.
The evidence in this case tended to show the following: between 8:30 a.m. and 9:00 a.m. on May 28, 1987, in Albertville, a neighbor saw 17-year-old Slaton in Mrs. Phillips's yard with a BB gun, shooting at birds. Mrs. *885 Phillips was Slaton's next-door neighbor. A short while later, the neighbor saw Slaton standing by Mrs. Phillips's front door, then saw him go into the house. He came out about 30 minutes later, the neighbor testified.
A friend of Mrs. Phillips's drove up about five minutes after the neighbor saw Slaton leave. The friend testified that he tried the front door, found the door unlocked, and went inside. He said he saw Mrs. Phillips lying on the bathroom floor, and when he tried to use the telephone to call for help, saw that it had been unplugged. The friend then left the house to get Mrs. Phillips's daughter, who worked nearby. When the pair returned to the house and Mrs. Phillips's daughter saw her mother's body, she called police and paramedics. Mrs. Phillips was dead when police arrived.
The evidence showed that Mrs. Phillips had been raped, beaten about the head, strangled, and shot in the chest. Semen taken from the victim's vagina matched Slaton's blood type. Slaton was arrested the day after the murder. While being interrogated by police, he gave a statement in which he confessed to shooting Mrs. Phillips during a scuffle over a gun.

I
Slaton argues that in charging the jury during the guilt phase of his trial, the trial court improperly informed the jury that it was getting only a portion of Slaton's statement because there were some inadmissible matters contained in the statement. Therefore, he says, his conviction is due to be reversed. We disagree.
Slaton's trial counsel did not object to the charge. In death penalty cases, failure to object does not preclude appellate courts from reviewing the issue under the plain error doctrine.
"In considering what constitutes `plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is `plain error.' See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala.1983), cert, denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
"In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only `particularly egregious errors' ... which are those errors that `seriously affect the fairness, integrity or public reputation of judicial proceedings'.... The plain error rule should be applied `solely in those circumstances in which a miscarriage of justice would otherwise result.' Young, supra, 470 U.S. at 16, 105 S.Ct. at 1047.
"Furthermore, the court noted that the plain error doctrine requires that the `claimed error not only seriously affects "substantial rights" [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.' Young, supra, 470 U.S. at 16, 105 S.Ct. at 1047, n. 14."
Dill v. State, 600 So.2d 343, 351 (Ala.Crim. App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293,122 L.Ed.2d 684 (1993); see also, Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert, denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). See also, Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd 577 So.2d 531 (Ala. 1991), cert, denied 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Ex parte Hinton, 548 So.2d 562, 568 (Ala.) cert, denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
During the trial of this case, portions of a transcript of Slaton's taped confession were read by one of the policemen who took the statement. Those portions were referred to by page number. The statement itself was never admitted into evidence. During its charge to the jury, the trial court gave the following instruction:
"The defendant's statement herein was not admitted nor offered in bulk because there were some inadmissible matters contained in the statement that could not come before you for your consideration. The reason *886 that it was not offered or admitted in bulk was for that reason."
Alabama law precludes a prosecutor from intimating to the jury that there is other evidence he would have introduced were it not for evidentiary rules. Ex parte Washington, 507 So.2d 1360 (Ala.1986). However, case law is silent as to whether the trial court, in its instructions to the jury, can mention that there is evidence the jury has not heard. In a noncapital case, this court has held, "Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts." Dooley v. State, 575 So.2d 1191, 1194 (Ala.Crim.App.1990); McNeely v. State, 524 So.2d 375 (Ala.Crim. App.1986), (quoting Oglen v. State, 440 So.2d 1172, 1175-76 (Ala.Crim.App.), cert, denied, 440 So.2d 1177 (Ala.1983)). "While a particular remark by the trial judge may be open to question, in order for it to amount to grossly improper error requiring reversal, it must have influenced the result of the case." Thompson v. State, 503 So.2d 871, 879 (Ala. Crim.App.1986), affd, 503 So.2d 887 (Ala. 1987), cert, denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155, reh'g denied, 484 U.S. 971,108 S.Ct. 471, 98 L.Ed.2d 410.
In this case, Slaton's statements regarding the rape, beating, strangling, and shooting were brought out in testimony. We find it hard to imagine that the jury would believe something even more prejudicial was being held from them. Also, because page numbers were referred to when the officer testified about the appellant's confession, the jury already was aware that it had not heard the entire statement. The trial court's jury charge was simply an explanation to the jury as to why it was not going to see the statement, and further served to clarify why the jury had not heard the whole statement. The trial court's jury instruction does not rise to the level of plain error requiring reversal.

II
Slaton next contends police continued to question him after he invoked his right to remain silent, violating his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Testimony from the statement allegedly made in violation of his rights was used at trial, and, therefore, Slaton argues, his conviction and death sentence should be reversed. We disagree.
Slaton was arrested the day after Mrs. Phillips's murder. He was taken to the Albertville Police Department, where one of two detectives interrogating him read him his Miranda warnings from an Alabama juvenile warning form. Slaton then signed the form, waiving both his right to remain silent and his right to have counsel present. When the detectives began their questioning, Slaton started crying. At trial, but out of the presence of the jury, Slaton said that when he was at the police station he was scared because, "[t]hey were police officers and they had come and arrested me. I didn't know what to think or what to do." During his interrogation, Slaton described to the police how he was in the yard shooting at birds when Mrs. Phillips pointed a gun at him and made him come into her home, where they talked a short while. One of the detectives asked, "Then what happened?" Slaton, who had begun crying again, responded, "Oh God, I don't feel like going through all this." The other detective then asked, "Did she have a gun on you at that time?" Slaton said, "Yes," and questioning continued.
Slaton contends that when he said he did not "feel like going through all this," he was invoking his right to remain silent. The police should have stopped questioning him then, he says, or at least asked for clarification on whether he was invoking his right to remain silent. The United States Supreme Court has held that police officers must inform people of their constitutional rights before beginning custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Included in the right to remain silent is a right to cut off questioning. Miranda, 384 U.S. at 474, 86 S.Ct. at 1628. When a defendant invokes his right to remain silent, that request must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
*887 This court recently stated that whether someone has invoked his right to remain silent is determined on a case-by-case basis.
"Whether there was a waiver of the right to remain silent and the right to counsel and whether the confession was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accusedthe totality of the circumstances."
Holmes v. State, 598 So.2d 24, 26 (Ala.Crim. App.1992); see also Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Magwood v. State, 494 So.2d 124 (Ala.Crim.App.1985), affd, 494 So.2d 154 (Ala.), cert, denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
In this case, the police were questioning an admittedly scared 17-year-old who had just been arrested for murder and rape. He was visibly upset but had given no indication that he did not want to cooperate with the detectives and appeared to be readily responding to their questions. We are not persuaded that Slaton's response, "Oh God, I don't feel like going through all this," was an unequivocal invocation of his right to remain silent. It does not strike us as any kind of conscious request that he be allowed to remain silent. Instead, Slaton's comment seems a natural outburst borne of the fear and anxiety created by the circumstances in which he found himself. Therefore, we hold that Slaton's statement was not an invocation of his right to remain silent, that his Miranda rights were not violated, and that his statement was properly used at trial.

Ill
Slaton also argues that the trial court committed reversible error when it failed to instruct the jury that it could reject Slaton's confession if it found it was not made voluntarily. Therefore, Slaton contends, his conviction is due to be reversed. Again, we disagree.
The record shows the trial judge gave the following instruction to the jury:
"With regard to the alleged statement of the defendant, you may consider all of the facts and circumstances surrounding the taking of the alleged statement in determining the weight and credibility, if any, which you give to the alleged statement.
"In exercising your exclusive prerogative of determining the credibility of evidence or the weight to which the evidence is properly entitled, the jury shall consider the circumstances under which the alleged statement was obtained and the appliances by which it was supposedly elicited, including the situation and mutual relations of the parties."
Slaton did not object to the jury instruction. In capital cases, failure to object does not preclude review of the issue by the appellate courts. However, such failure weighs against any claim of prejudice. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), affd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala. Crim.App.1990), affd, 577 So.2d 531 (Ala. 1991), cert, denied 502 U.S. 886, 112 S.Ct. 242, 116, L.Ed.2d 197 (1991). "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert, denied, Waites v. United States, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).
Slaton argues that the trial court's jury instruction did not make clear that before the jury could consider his statement as evidence, it had to determine whether it was given voluntarily. That argument, however, is contrary to the law. "Separate triers of fact must determine the voluntariness of a confession for purposes of admissibility on the one hand and the credibility of a confession on the other hand, with voluntariness being a factor permissibly considered as bearing on credibility." Ex parte Shula, 465 So.2d 452, 454 (Ala.1985), citing Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Whether a confession is voluntary is initially to be determined by the trial court. Ex parte Bankhead, 585 So.2d *888 112 (Ala.1991); Ex parte Singleton, 465 So.2d 443 (Ala.1985). "Thereafter, the voluntariness, as affecting the credibility and weight to be given any statement that an accused has made, is a determination for the jury." Id.
In the case before us, the trial court instructed the jury to consider all the circumstances surrounding the taking of Slaton's statement in determining how much weight and credibility, if any, to give the statement. The trial court went on to tell the jury that in exercising its "exclusive prerogative" of determining the weight and credibility of the statement, it was to take into account the circumstances surrounding the statement and the parties' relationship to one another.
It is not the jury's duty to determine the voluntariness of the statement before considering it as evidence, as Slaton argues in his brief. We hold the instruction given the jury regarding Slaton's statement is a correct statement of the law, and therefore not plain error requiring reversal.

IV
Slaton also contends that the trial court erred in admitting testimony from a transcript of an unauthenticated tape recording of his alleged confession. At trial, one of the detectives who questioned Slaton the night of his arrest testified as to Slaton's statement. The record shows that he testified both from his memory and after referring to a transcript made from an audio tape of the statement. At times, the State would ask specific questions from the transcript, and the detective would read Slaton's response. Neither the tape recording nor the transcript, in whole or in part, were offered into evidence. Slaton argues that because the tape recording was not authenticated, the testimony from the transcript was not properly admitted into evidence.
At trial, Slaton did not object to the State's use of the statement in this manner. As noted above, in capital cases, failure to object does not preclude review of the issue by an appellate court. However, such failure weighs against any claim of prejudice. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293,122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala. 1991), cert, denied 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, Waites v. United States, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).
We fail to find plain error as to this issue. Because neither the tape recording nor the transcript were admitted into evidence, no foundation was required. The witness who read portions of the transcript at trial was one of the detectives who questioned the appellant and was present during the entire interrogation; therefore, he had firsthand knowledge as to all that he testified. The witness was able to testify to what Slaton said in response to questions by both detectives because admissions of the defendant are admissible. McLaney v. City of Montgomery, 570 So.2d 881 (Ala.Crim.App. 1990).
The detective also testified regarding the taping of the session during which Slaton was questioned, as well as regarding having a transcript of the tape. The detective first testified about the statement from his own recollection, then read portions of the transcript. The trial court's admission of testimony from the transcript does not rise to the level of plain error requiring reversal.

V
Slaton next contends his constitutional rights were violated because the prosecutor improperly commented on his failure to testify. According to the record, in his final closing argument, the prosecutor told the jury:
"The defense has paraded five or six or seven people into the witness stand and they have testified and they have testified about a condition called intermittent explosive disorder. It's a condition that is listed in this book that they call the bible of *889 diagnostic care for mental patients, diagnosing mental disorders....
"Yesterday, Dr. Nagi testified, and he said that it was so controversial and so unaccepted that it will not even appear in DSM-IV. That's this condition that they want you to accept, buy, come back with a verdict of this defendant not only has, but had, and that it was manifesting itself at the exact moment of this crime. Because, you see, a mental condition, a mental defect in and of itself is not enough, ladies and gentlemen. But there must be proof to you, to you as a jury, that the mental defect was being applied or was in effect or was manifesting itself at the time of the crime.
"The court will charge you on the law regarding mental defect or disease. And one of the things that the law says is that if a person has lucid periods then it must be proven that he is not in one of those lucid periods when the crime happens. And I ask you to just for a moment disregard for a moment all the psychiatric, the psychologist and social worker testimony that you've heard, and tell me one shred of evidence that you've heard that Nathan Slaton, at the time Mrs. Phillips was raped and murdered, was suffering from any type of mental disease or defect, and that that caused him to do this without the appreciation of the criminality of it.
"Oh, I knowI know that some of their witnesses have gotten on the witness stand and said, well, hypothetically, if a person had intermittent explosive disorder, and hypothetically if while having that condition they had one of these explosions, would they be able to appreciate the criminality of the act during that explosion? And two or three of the doctors have said they would not, they would not be able to control themselves.
"I know that evidence is out there. That is a supposition that if they had it, number one, and that if it was manifesting itself in the form of one of these explosions, number two, that they would not at the time of that manifestation be able to control themselves. But what evidence is out there, ladies and gentlemen, that on May the 28th of 1987, between 9:00 and 9:30 in the morning that Nathan Slaton had one of those explosions?"
Slaton argues that because the evidence was uncontroverted that he and the victim were the only two people present at the time of the murder, only he could testify as to what happened in that half hour, providing the necessary evidence of "one of those explosions." Therefore, Slaton says, the prosecutor improperly commented on his failure to testify. We disagree.
"Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated." Windsor v. State, 593 So.2d 87, 91 (Ala.Crim.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969), cert, denied, 284 Ala. 732, 223 So.2d 603 (1969).
"In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a close identification of the defendant as the person who did not become a witness." Witherspoon v. State, 596 So.2d 617, 619 (Ala.Crim. App.1991), and Windsor, supra, both quoting Ex parte Williams, 461 So.2d 852 (Ala.1984); and United States v. Norton, 867 F.2d 1354, 1364 (11th Cir.), cert, denied, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). As this court said in Windsor, a key determination is whether only the defendant could have provided the missing evidence.
In this case, the prosecutor's argument, taken in context, does not seem to us to be an indirect reference to Slaton's failure to testify, nor is Slaton closely identified as the witness who failed to testify. At trial, experts testified as to how, after explosive behavior, there is a long period of sleep, or sleepiness. However, the record shows that when police were at the crime scene the morning of the murder, Slaton was in his yard watching what was going on. He also told police he did laundry that morning. Slaton's statement to police is a coherent, chronological version of what he says happened, and there is no indication of blackouts or any other sign that he was suffering from the *890 symptoms of intermittent explosive disorder as suggested by defense experts. In short, the prosecutor's statement asking the jury to think of what evidence there was to show Slaton had experienced an explosive situation was simply a way of pointing out that all of the evidence tended to show that Slaton was not suffering from a mental disease or defect at the time of the murder, despite the testimony of the defense's expert witnesses.
It is a stretch to say the prosecutor's argument is a comment on Slaton's failure to testify or on anyone else's failure to testify. Rather, the prosecutor's argument is better understood as a comment that the evidence before the jury failed to back up the experts' claims of possible mental disease or defect. Therefore, we hold that the trial court did not commit reversible error when it allowed the prosecutor's statement to stand.

VI
Slaton next contends the trial court committed reversible error by allowing the State's expert witnesses to testify as to their opinions of Slaton's mental condition based on hospital records not admitted into evidence.
The traditional rule in Alabama regarding expert testimony used to be that expert testimony based on the conclusions or opinions of others was not admissible. See Chinevere v. Cullman County, 503 So.2d 841 (Ala.1987). However, the Alabama Supreme Court modified that rule, allowing a medical expert to give his opinion based in part on the opinions of others. Nash v. Cosby, 574 So.2d 700 (Ala.1990). In Ex parte Wesley, 575 So.2d 127, 129 (Ala.1990), the Supreme Court clarified its holding in Nash and held that the information upon which an expert relies still must be in evidence. Most recently, in T.G.S. v. D.L.S., 608 So.2d 743 (Ala.CivApp. 1992), the Court of Civil Appeals quoted a special concurrence by Justice Houston regarding the Supreme Court's current position as to the admissibility of opinion testimony from expert witnesses:
"`It is my understanding that an expert witness may give opinion testimony based upon facts of which he has personal knowledge; based upon opinions of others, if these are opinions of a type customarily relied upon by the expert in the practice of his profession; or based upon facts that are assumed in a hypothetical question. In any event, the facts known to the expert, the opinions of others of a type customarily relied upon by the expert in the practice of his profession, and the hypothesized facts must all be facts in evidence.' W.S. v. T.W., 585 So.2d 26 (Ala.1991) (Houston, J., concurring)."
T.G.S. v. D.L.S., 608 So.2d 743 (Ala.Civ.App. 1992).
In his brief to this court, Slaton argues that two experts who testified as rebuttal witnesses for the state should not have been able to testify as to their opinions of Slaton's mental condition at the time of the crime because, he says, they relied on facts not admitted into evidence when giving their opinions. We disagree.
The first expert used by the state to rebut evidence that Slaton had a mental disease or defect, Dr. Wilburn Rivenbark, testified that he had administered a psychological test to Slaton. The record shows that the witness explained how the test was administered. He then said that he scored the test, and he explained how scoring was done. The expert then testified generally about Slaton's test results. Finally, he gave his opinion as to what those results meant. Because the expert did not give his opinion on whether Slaton had a mental disease or defect until after he had testified about how the test was administered and scored and about the test results, we believe the opinion was based on facts already in evidence, as required. Therefore, the trial court did not err in allowing Dr. Rivenbark to give opinion testimony.
The second expert called by the state to rebut testimony of mental disease or defect, Dr. Kamal Nagi, relied on several factors in reaching his diagnosis, including a personal history and personal interview with Slaton; Slaton's behavior during hospitalization as recorded by a team of people working with Dr. Nagi, including a social worker, therapist, psychologist, nurse and psychiatrist; and psychological testing. This testimony *891 was not objected to by Slaton's trial counsel. While failure to object does not preclude review of the issue by the appellate courts, such failure weighs against any claim of prejudice. Dill, 600 So.2d at 351. In reviewing the issue, we apply the plain error doctrine, which should be used to correct only "particularly egregious errors." Id. The plain error rule should be applied "solely in those circumstances in which a miscarriage of justice would otherwise result." Id.
As to the psychological test relied on by Dr. Nagi in forming his opinion, because Dr. Rivenbark testified regarding the psychological test before Dr. Nagi testified, facts surrounding the test were already in evidence and could serve as a proper basis for allowing Dr. Nagi's opinion testimony. Dr. Nagi said he also relied upon a personal interview with Slaton in reaching his diagnosis. According to Dr. Nagi's testimony, the interview lasted between four to five hours. In the record, Dr. Nagi's testimony appears disjointed and often unresponsive, but eventually he explains enough about the facts he gathered from the interviewnot only from what Slaton told him, including a social history, but also his observations of Slatonso that the facts surrounding the personal interview and the social history are in evidence and can properly serve as a basis for Dr. Nagi's opinion testimony.
Less clear, however, is whether Dr. Nagi's testimony was proper insofar as his reliance upon notes and records kept by the team of people who worked with Slaton, as well as his reliance on other psychological tests administered to Slaton. Since Nash, expert witnesses may rely on the opinions of others, if those opinions are customarily relied upon by professionals in the field and if they are in evidence. However, the record shows that in this case, the substance of those records and tests were never testified to, nor were they admitted into evidence. As stated above, however, Slaton's trial counsel never objected to Dr. Nagi's opinion testimony.
While failure to object does not preclude review of the issue by the appellate courts, such failure weighs against any claim of prejudice. Dill, 600 So.2d at 351. We do not believe Dr. Nagi's opinion testimony was a "particularly egregious error" requiring reversal under the plain error doctrine. The plain error rule requires reversal only when not to do so would be a miscarriage of justice. Dr. Nagi testified as to what he considered in making his diagnosis as well as how he arrived at his diagnosis. Defense attorneys were allowed to cross-examine him thoroughly. Two other expert witnesses were called by the State to rebut defense experts, so the jury did not have to rely solely on Dr. Nagi's testimony. We hold that allowing Dr. Nagi to give opinion testimony in this case does not rise to the level of plain error requiring reversal.

VII
Slaton also maintains that during closing arguments, the district attorney misstated the evidence in this case, resulting in reversible error. This argument is without merit. Slaton alleges that in the rebuttal portion of the prosecutor's closing argument, the prosecutor misstated the evidence on a number of issues concerning the testimony of defense experts. The prosecutor failed to distinguish between the admitting diagnosis and the discharge diagnosis made by the psychiatric center relied upon by the defense, Slaton says. Also, he contends that the prosecutor misrepresented the evidence relating to how the diagnosis was reached and impeached the experts by asserting that "Slaton had not received any medication while in jail, yet had manifested no mental health difficulties during that time." (Appellant's brief at 41.) At trial, Slaton's attorney objected to this assertion after the prosecutor finished his closing argument, saying it was based on facts not in evidence. He refused a curative instruction on the issue, however. Slaton also maintains that the district attorney incorrectly asserted that the disorder Slaton was diagnosed as having was no longer accepted among mental health care professionals.
The law is clear that in closing arguments, attorneys may comment on evidence and draw any reasonable inferences from the evidence. "Whatever is in evidence is considered subject to legitimate comment by counsel." Bamberg v. State, 611 So.2d *892 450, 453 (Ala.CrimApp.1992) (quoting Williams v. State, 601 So.2d 1062 (Ala.Crim. App.1991). Prosecutors may argue any legitimate inferences that may be drawn from the evidence. Bamberg v. State, 611 So.2d at 453. Prosecutors may also argue any legitimate replies to arguments put forward by the defense. See Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd 603 So.2d 412 (Ala.1992), cert, denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). "Liberal rules must be allowed counsel in drawing inferences from the evidence in his argument to the jury." Adams v. State, 587 So.2d 1265 (Ala.CrimApp.1991).
After a careful review of the record, we find that most of the statements complained of by Slaton were merely the prosecutor's replies to the closing arguments of Slaton's defense attorneys. The district attorney certainly was entitled to compare the diagnosis made by the defense experts with the diagnosis made by the State's experts. He also was permitted to characterize the evidence so as to defend the way the State's experts reached their diagnosis and to criticize the way the defense experts reached their diagnosis. The district attorney merely drew inferences from the evidence and characterized the evidence in a manner with which Slaton's attorneys disagree.
On the other hand, the district attorney's statement that Slaton had not been on medication in the jail does appear to be based on facts not in evidence, as Slaton's attorney argued at trial. However, after objecting to the statement, defense attorneys as a strategy decision refused a curative instruction, saying a curative instruction would only serve to reinforce the comment. Furthermore, the trial court instructed the jury that the arguments of the attorneys were not evidence in the case.
When a defense attorney chooses to "refuse any corrective instructions, appellant may be said to have waived his original objection. `[A] defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.'" Collins v. State, 385 So.2d 993,1002 (Ala.Crim.App.1979), rev'd on other grounds, 385 So.2d 1005 (Ala.1980); see, also, Ex parte Thomas, 625 So.2d 1156, 1158 (Ala.1993) (and cases cited therein). Because defense counsel refused a curative instruction, and because the trial court instructed the jury that what the attorneys said during their arguments was not evidence in the case, we believe the prosecutor's statement was not so prejudicial as to require reversal.

VIII
Slaton maintains that the trial court's instruction to the jury regarding the presumption of innocence violated his due process rights. The trial court's instruction on the presumption of innocence was as follows:
"In coming before you, a jury of his peers, upon his plea of not guilty by reason of mental disease or defect, the defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberation on the verdict and is not overcome unless from all the evidence in the case, you are convinced beyond reasonable doubt that the defendant is guilty. The presumption of innocence with which the defendant enters into a trial is a fact in the case which must be considered with all the other evidence and is not to be disregarded by you."
(R. 2078-79.)
Slaton argues that a later instruction regarding reconciling conflicts in the evidence would lead jurors to believe they could assign some weight to the presumption of innocence. (R. 2098.) This argument is without merit.
The jury instructions Slaton questions were not objected to at trial; therefore, to be reviewed by this court, any error that could be shown must be plain error. However, we believe the trial court gave proper instructions as to the presumption of innocence and as to the reconciling conflicting evidence; therefore, there is no error. As this court has held, "It is the charge in its totality and not some `magic words' that must determine whether the defendant's rights have been protected or error committed. In the present case, the defendant was certainly protected *893 and his right to the presumption of innocence was adequately put before the jury." Finley v. State, 606 So.2d 198, 201 (Ala.Crim. App.1992), quoting Carroll v. State, 407 So.2d 177, 179 (Ala.1981); Grace v. State, 456 So.2d 862 (Ala.Crim.App.1984).
In this case, the questioned charges were not given in conjunction with each other. The jury clearly was instructed that the presumption of innocence was to remain with Slaton even into the jurors' deliberations, and the presumption could be overcome only if the jury was convinced beyond a reasonable doubt that Slaton was guilty. Slaton argues that because he was found guilty, the jury perceived a conflict between the State's evidence and the presumption of innocence. Because the jury was told to assign to each piece of evidence just such weight as it thought the evidence should receive, Slaton says, the jury wrongly assigned some weight to his presumption of innocence and therefore his conviction should be overturned. Slaton makes the unreasonable assumption that the jury disregarded the instruction on the presumption of innocence simply because it convicted him. Slaton's argument is frivolous, and the trial judge properly instructed the jury as to the presumption of innocence.

IX
Slaton also contends that the State failed to prove an adequate chain of custody regarding the body of the victim, vaginal swabs taken from the body, and saliva samples taken from Slaton.

A
The record shows that the body of the victim was photographed at the crime scene in Albertville. Rodger Morrison of the Alabama Department of Forensic Sciences was at the scene, and he testified as to the condition of the body at that time. The State's next witness was Dr. Joseph Embry, also with the Alabama Department of Forensic Sciences, who performed the autopsy on the body at Cooper Green Hospital in Birmingham. He testified as to the condition of the body when he received it. The State offered no testimony, however, as to what happened to the body in the interim. There was no evidence as to who had custody of the body when it was removed from the crime scene, how or when the body was transported from Albertville to the hospital in Birmingham, or who first took possession of the body at the hospital.
Slaton failed to object when Dr. Embry testified about the autopsy and cause of death; therefore, we must review this issue under the plain error doctrine. Failure to object weighs against a claim of prejudice to the defendant. "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim.App.1992); Smith v. State, 583 So.2d 990 (Ala.Crim.App.1991, cert, denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim.App.1990), rev'd 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala. Crim.App.), appeal after remand, 591 So.2d at 149 (Ala.Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984). In Gordon, this court held that because there was no evidence that the victim's body had been tampered with in any way, a sufficient chain of custody had been established. Gordon, 587 So.2d at 433.
In this case, the record shows testimony was given as to the nature and location of wounds on the body before the body was removed from the crime scene. Dr. Embry's testimony as to the nature and location of the wounds when the autopsy was performed was consistent with Rodger Morrison's earlier testimony. Unlike blood samples, saliva samples, drugs seized from a defendant, and the like, all of which may be tampered with or even switched with no visible signs that something is different, a body can be identified as the same body that left the crime *894 scene, and that there was not a substitution. Also, only the "remotest possibility" exists that someone would tamper with the body, especially to the extent suggested in this casethat semen from someone with the same blood type as Slaton's, even though Slaton's blood type was not yet known, was somehow deposited in the victim's body during the time the body was unaccounted for.
Because consistent testimony was given as to the condition of the body at both ends of the chain, because it is clear that there was no substitution of the body and no evidence that the body had been tampered with, and because this issue must be reviewed under the plain error doctrine, we hold that admitting testimony regarding the body did not rise to the level of plain error requiring reversal.
Also, vaginal swabs taken from the victim's body were properly admitted into evidence, because, once taken from the body, there is no missing link in the chain of custody of the swabs.

B
Slaton also argues that the state failed to establish a proper chain of custody for saliva samples taken from him. This argument is without merit. The record shows that the detective who took the saliva sample testified that he had Slaton put the sample in an envelope, which he then sealed. Another detective who was present when the sample was collected said Slaton put the sample in a "little container." The first detective then testified that he personally handed the sample over to Brent Wheeler of the Alabama Department of Forensic Sciences. Mr. Wheeler testified that he accepted a sealed "plastic bottle" from the detective, and that he, in turn, gave the bottle to Rodger Morrison of DFS, who conducted the test. Mr. Morrison also testified that he accepted the plastic bottle.
In Ex parte Holton, 590 So.2d 918 (Ala.1991), which dealt with whether there a proper chain of custody had been established regarding cocaine, the Alabama Supreme Court presented an analysis to be followed in determining whether a proper chain of custody has been shown. First, to lay a sufficient predicate for admission of evidence, the State must establish a chain of custody without breaks. Holton, supra; Ex parte Williams, 548 So.2d 518, 520 (Ala.1989).
"Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App. 1988)....
"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' (Citation omitted.)
"If the State ... fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a Veak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."
Holton, at 919-20.
Here, all the links in the chain testified as to the receipt and safeguarding of the saliva sample, and each testified that when he turned over the evidence to the next link, it was in the same condition as when it was received. There are no gaps in the chain of custody. The discrepancy regarding whether *895 the sample was initially placed in an envelope or some sort of other container goes to the weight and credibility of the evidence, not to its admissibility. Therefore, we hold the trial judge properly admitted evidence as to the saliva samples into evidence.

X
Slaton also maintains that the trial court's instruction to the jury that it could find evidence unworthy of credit only if it was unable to reasonably reconcile all the evidence violated his rights. There was no objection to the instruction at trial; therefore, we must review this issue under the plain error doctrine.
The record shows the trial court gave the following instruction to the jury:
"You should weigh all the evidence and reconcile it if you can reasonably do so, but if there is a conflict in the evidence which is not capable of reconciliation, you ought to take that evidence which you think is worthy of credit and give it just such weight as you think it is entitled to receive. In doing so, you may take into consideration any interest which any witness might have been shown to have in the outcome of the case. If you believe that any material part of the evidence of any witness was willfully false, you may disregard all of the testimony of such witness."
Slaton contends that instruction is tantamount to instructing the jury that there is a presumption that all testimony is truthful. We disagree.
The trial court told jurors that they should weigh the evidence, implying that not all the evidence is going to be as good or as strong as other evidence and that all evidence did not have to be considered equally. The trial court's instruction that if there was evidence not capable of being reconciled, the jury should "take that evidence which you think is worthy of credit and give it just such weight as you think it is entitled to receive" gave the jury further notice that it was not required to consider testimony it did not find credible. Also, the trial court explicitly instructed the jury that if it believed any material part of a witness's testimony to be false, it could disregard all of that witness's testimony. We fail to see how the instruction gave the jury the idea that all testimony is presumed truthful, as Slaton argues.
Even if the quoted paragraph were construed to mean that all testimony is presumed truthful unless it cannot be reconciled, it would still be harmless error in this case. The trial court gave a number of charges to the jury instructing it that it had the "exclusive prerogative" to determine the weight or credibility of the evidence. The jury was instructed to "[t]ake the testimony of the witnesses together with all proper and reasonable inferences therefrom. Apply your good common sense and in an impartial and honest way determine what you believe to be the truth." From reading the jury charges as a whole, we conclude that the trial court made clear to the jury that it was free to accept or reject any part of the testimony given by any witness. "`The fact that isolated instructions are erroneous or misleading is no ground for reversal where the instructions as a whole present the case properly.'" Sosa v. State, 591 So.2d 897, 899 (Ala.Crim. App.1991), quoting Williams v. State, 538 So.2d 1250, 1253 (Ala.Crim.App.1988); Harris v. State, 412 So.2d 1278 (Ala.Crim.App. 1982).
The jury instructions as a whole presented the case properly; thus, we hold the trial court's instruction regarding the reconciliation of testimony does not amount to plain error.

XI
Slaton argues that the trial court's jury instruction in both the guilt phase and penalty phase of the trial regarding reasonable doubt could have led a reasonable juror to find him guilty based on a degree of proof below that required by due process. The charge, Slaton claims, violates the United States Supreme Court's decision in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Once again, this jury charge was not objected to at trial. Therefore, we must apply the plain error doctrine when reviewing this issue.
*896 The trial court instructed the jury as follows:
"The term `reasonable doubt' has been used throughout the charge and throughout the case and argument of counsel. As I have told you, the burden of proof is upon the State of Alabama to prove beyond reasonable doubt that the defendant is guilty of the offense charged. That phrase, reasonable doubt, is somewhat self-explanatory and efforts to define it do not always clarify the term. But it may help you some to say that a doubt which would justify an acquittal must be an actual and substantial doubt and not a mere possible doubt. A reasonable doubt is not a mere guess or surmise and it is not a forced or captious doubt.
"If after considering all the evidence in the case, you have an abiding conviction of the truth of the charge then you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable fair-minded and conscientious men and women would entertain under all the circumstances.
"Now, you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt and to a moral certainty. If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt, then you are not convinced beyond a reasonable doubt and the defendant would be entitled to an acquittal."
During the penalty phase of the trial, the trial court told the jury to recall the definitions of reasonable doubt and moral certainty given during the guilt phase when deciding whether aggravating circumstances existed.
Slaton contends that this instruction equates reasonable doubt with substantial doubt, and, therefore a juror could have found Slaton guilty on a degree of proof below that required by the Due Process Clause. In Cage v. Louisiana, the United States Supreme Court found that if "reasonable doubt" were defined by using the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty," a reasonable juror could interpret the instruction to mean that a lesser degree of proof is needed to convict than is required by the Due Process Clause. The use of all three phrases is what the Court found unconstitutional in Cage. See Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277,114 L.Ed.2d 728 (1991).
In construing a jury instruction, we do so in the context of the charges as a whole. Haney v. State, 603 So.2d 368, 411 (Ala.Crim.App.1991), affd, 603 So.2d 412 (Ala.1992), cert, denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert, denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970). In this case, the trial court included the phrases "actual and substantial doubt" and "moral certainty" in its charge to the jury regarding reasonable doubt. As this court said in Haney, use of some, but not all, of the phrases examined in Cage to define reasonable doubt does not necessarily constitute reversible error. Haney, supra at 412. In looking at the jury charges as a whole in this case, we find that these instructions do not contain the same flaw as the charges in Cage. The definition of reasonable doubt correctly conveyed the meaning of reasonable doubt and did not confuse or mislead the jury. The trial court's instructions on the presumption of innocence, the burden of proof, and the responsibilities of the jury in weighing the evidence support this conclusion. E.g. McMillian v. State, 594 So.2d 1253, 1283 (Ala.Crim.App.1991), Haney v. State, 603 So.2d at 412. Therefore, the trial court did not commit plain error in giving the above charge to the jury regarding reasonable doubt.
Also, the reasonable doubt instruction is substantially the same as the Alabama Pattern Jury Instruction recommended by the Alabama Supreme Court and in effect at the time of Slaton's trial. This further cuts *897 against a finding of plain error, especially in the absence of an objection by the defendant at trial. E.g. McMillian, supra; Haney, supra.

XII
Slaton next contends that detectives failed to give him his Miranda warnings before he voluntarily gave them samples of hair from his head, pubic hair, and saliva, thus violating his rights. This argument is without merit.
Detectives gave Slaton his Miranda warnings before questioning him, and the samples were taken immediately after he gave his statement to police. Moreover, Miranda warnings are not required for such samples taken while the person is in lawful custody "because the sample is not `testimonial' or `communicative' evidence as required by the Supreme Court in order for the Fifth Amendment privilege to apply." Parker v. State, 587 So.2d 1072, 1090 (Ala.Crim.App. 1991), after remand, 610 So.2d 1171 (Ala. Crim.App.), affd; 610 So.2d 1181 (Ala.1992), cert, denied, 509 U.S. 929,113 S.Ct. 3053,125 L.Ed.2d 737 (1993).

XIII
Slaton contends his statement was admitted without adequate corroboration in violation of his constitutional rights. This argument also is without merit.
Under Alabama law, a confession is not admissible unless there is independent evidence tending to prove the corpus delicti. Spear v. State, 508 So.2d 306 (Ala.Crim.App. 1987), cert, denied, 537 So.2d 67 (Ala.1988). "The corpus delicti is made up of two elements: (1) that a certain result has been produced, for example, a man has died or a building has been burned; and (2) that some person is criminally responsible for the act." Spear, supra at 308, quoting C. Gamble, McElroy's Alabama Evidence, § 304.01, (4th ed. 1991)). Circumstantial evidence may afford satisfactory proof of the corpus delicti. Magwood v. State, 494 So.2d 124, 149 (Ala. Crim.App.1985), affd 494 So.2d 154 (Ala. 1986), cert, denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
In this case, the corpus delicti was established independently of Slaton's statement to police. The evidence tended to show that a neighbor who had talked with the victim the morning of the murder watched Slaton go into the house, and kept watch on the house until she saw him come out again about 30 minutes later. The victim's body was discovered about five minutes later. The victim had been shot and strangled, and there was a liquid that appeared to be semen coming from the victim's vagina. Such evidence is certainly sufficient to support a reasonable inference that the victim in this case had been intentionally killed during the commission of a rape, and that some person was criminally responsible for those acts. Once the State has proved the corpus delicti by independent evidence, the appellant's confession can be used to prove his participation in, and his guilt of, the crime for which he was charged. Magwood, supra.
Therefore, we hold that Slaton's statement was sufficiently corroborated by other evidence and properly admitted into evidence.

XIV
Slaton also argues that the trial court's supplemental instructions to the jury during the sentencing phase were coercive and censorious and goaded the jury into reaching a verdict. Specifically, Slaton says, the supplemental charge given pursuant to Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), was "botched" and requires reversal.
During the course of its sentencing phase deliberations, the jury sent a note to the trial court asking, "What happens if we cannot come up with enough numbers to go either way?" In response to the question, the trial court gave the following instruction:
"Now, ladies and gentlemen, I don't want to know what the vote is, that's not any of my business at this point, what your vote is, so don't give me anything concerning the numerical count of your vote. But it is highly desirable and important if there is any way possible, ladies and gentlemen, that you reach a verdict. And, of course, it *898 is your duty, sworn duty, to do so if you can. You are urged to make every effort to reach a verdict consistent with your conscience. You should lay aside mere pride or judgment of opinion. You should examine your difference in a spirit of openness, fairness and candor. Reason together over any differences that you have and harmonize, if possible. Have a proper respect for each other's opinion and listen to each other's opinion.
"In direct answer to your question, if you cannot agree, if you cannot reach the numbers that are necessary under the law, I think you know what the Court will have to do. I would have to declare a mistrial and the case might have to be tried again as far as the sentencing phase that you are in at this time.
"I'm sure that no other jury that we could get would havewould ever get the facts any better than you have them. Witnesses might become scattered or people might become disabled to come to Court. In other words, you have the primary amount of evidence that could be given to any other jury. Reason together. Harmonize your differences if you can. Just as it is the duty of the majority to consider the views of the minority, so it is the duty of the minority to discuss and consider the views of the majority.
"A jury, as you have already proven in your decision yesterday, is a deliberative body and each juror should stand by and hear the arguments of the other jurors and the impressions made upon them by the evidence. If there is a disparity of opinion, you should confer together, paying a proper respect to each other's opinion and listening to each other's arguments.
"The end result, the duty that you have, is to reach a verdict if it is possible. This can be done often times by presentation and discussion of contrary views. If the majority is of one opinion, the jury may take that fact into consideration in your deliberation.
"A juror dissenting from the majority should consider whether a doubt in his or her own mind is a reasonable one when it makes no impression upon the minds of other jurors. Equally honest, intelligent and sincere arguments, equally honest, intelligent and sincere jurors, equally honest, intelligent and sincere opinions. And those of you who have heard the same evidence with the same attention and have the equal desire to arrive at the truth.
"While a minority should not, cannot, and will not be coerced by the Court into agreement with the majority, a minority should ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated.
"You realize, of course, that the amount of time, the amount of effort that you have put into it, that everyone has put into this case, is something that you should try to reach an ending point with, or a decision if at all possible.
"I don't want you to think, however, that the Court is attempting to coerce you in any way reaching a decision. The important part of the jury is if there is even one dissenting personnot in this phase, but in the guilt phase that we hadif there was even one, there would not be any wish on the part of the Court to force that person to give up his or her honest and sincere belief and opinion. However, now is the time for you to prove that you are a deliberative body that is interested in hearing the views of each other, not in an argumentative fashion, not in a fashion standing on your own opinions as if were the only right one, but in a spirit of discussion and attempting to arrive at a just and true verdict.
"I am not trying, again, to put you on any kind of guilt feeling. However, I do remind you that you took an oath the Tuesday that you were chosen that you would well and truly try the issues herein and a true verdict render according to the evidence, so help you God.
"Again, I ask you if you will, discuss further. I don't want to declare a mistrial at this point. I want you to discuss further and see if you can reach a decision."
Slaton's trial counsel objected to the charge saying it was "highly prejudicial" to *899 Slaton. The defense also claimed that "undue emphasis was placed on the jury's necessity in reaching a verdict to the extreme detriment of the defendant."
"The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned." King v. State, 574 So.2d 921, 927-28 (Ala.Crim.App.1990) (quoting McMorris v. State, 394 So.2d 392 (Ala. Crim.App.1980), writ denied, 394 So.2d 404 (Ala.1981), cert, denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981). An Allen charge, also known as a "dynamite charge," is permissible if the language of the charge is not coercive or threatening. Grayson v. State, 611 So.2d 422, 425 (Ala.Crim.App. 1992); King v. State, 574 So.2d at 928. We find that in giving the supplemental charge, the trial court did not suggest which way the verdict should be returned, and the charge was not in any way coercive or threatening. Thus, no error occurred in the supplemental charge to the jury.

XV
Slaton also maintains that the trial court's instructions to the jury regarding the function of mitigating circumstances precluded individualized sentencing and mandated a death sentence in this case. The State points out that Slaton's trial counsel did not object to the sentencing phase jury charges on the ground that they mandated a sentence of death; therefore, to be reversible, the instructions concerning this issue must rise to the level of plain error.
During the penalty phase of the trial, the trial court gave three instructions on mitigating circumstances that Slaton contends were improper and mandate that his death sentence be reversed. The jury was instructed as follows:
"A mitigating circumstance is any circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without parole instead of death."
"In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence with life imprisonment without parole instead of death."
"Mitigating circumstances are any facts relating to Mr. Slaton's age, character, education, environment, mentality, life and background or any aspect of the crime itself which may be considered extenuating or reducing his moral culpability or making it less deserving of the extreme punishment of death. You may consider as a mitigating circumstance any circumstance which tends to justify the penalty of life imprisonment."
When those instructions are taken together, Slaton argues, they clearly suggest that death is presumed to be the correct sentence. However, the trial court in this case also charged the jury that if it found that the State proved any aggravating circumstances, "that does not automatically or necessarily mean that you can sentence Nathan Slaton to death by electrocution." The jury also was instructed that in order to recommend the death penalty, each juror must believe beyond a reasonable doubt that at least one aggravating circumstance exists; otherwise, it must return a recommendation of life in prison without parole. Thus, the jury instructions in this case did not suggest that death was the correct sentence in this case.
The trial court also instructed the jury that it could consider anything as a mitigating circumstance; it was not confined to a list of possible mitigating circumstances. The court then defined a mitigating circumstance. This court has adopted the holding in Blystone v. Pennsylvania, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), which said, "The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." Haney v. State, 603 So.2d 368, 390 (Ala.Crim.App.1991). Here, the trial court instructed the jury that it could consider anything as a mitigating circumstance, *900 to be weighed against the aggravating circumstances, if any. Therefore, the trial court's instructions did not preclude individualized sentencing.
Furthermore, the reviewing court must consider challenged jury charges as a whole. Stewart v. State, 659 So.2d 122 (Ala.1993). When the trial court's instructions during the sentencing phase of the trial are considered in their entirety, and the charges criticized by Slaton are reviewed in context, clearly the instructions given to the jury in this case do not presume that death is the appropriate punishment upon the finding of the existence of at least one aggravating circumstance, and there is no plain error. Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990).

XVI
Slaton also argues that the jury instructions given during the penalty phase of his trial wrongly suggested that the jury must unanimously find that a particular mitigating circumstance existed before it could be considered. The instruction that Slaton finds objectionable is as follows:
"Unless each and every one of you can say with certainty that you do not possess a residual doubt as to the identity of the victim's killer, then as a jury you must consider the existence of such a residual doubt as a mitigating circumstance that warrants a sentence of life in prison rather than death by electrocution."
Slaton's argument must fail on two grounds. First, the instruction he now complains of was one of his requested jury charges. According to the record, the instruction was read to the jury exactly as it appears in Slaton's requested jury instruction number 14. Slaton's trial counsel did not object to the instruction when it was given. "`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'" Campbell v. State, 570 So.2d 1276, 1282 (Ala. Crim.App.1990) (quoting Leverett v. State, 462 So.2d 972, 976-77 (Ala.Crim.App.1984)).
Second, we fail to see how the requested charge suggests that the jury must unanimously find the mitigating circumstance of residual doubt. The instruction says that if even only one juror has a residual doubt, the entire jury must consider that doubt as a mitigating circumstance. Even in his brief to this court, Slaton argues that the instruction "wrongly suggests that even if only a single juror is unable to say with certainty that he or she does not possess a residual doubt, each of the twelve jurors must consider residual doubt as a mitigating circumstance." (Emphasis in original.) We would think that a defendant convicted of capital murder would welcome a situation in which all jurors must consider residual doubt as a mitigating circumstance if only one member of the jury actually had a residual doubt. The instruction certainly does not harm Slaton. For the reasons stated above, the instruction does not constitute reversible error.

XVII
Slaton next argues that the trial court's refusal to give certain of his requested jury charges deprived him of a fair trial.

A
Slaton requested that the jury be given the following instruction:
"In your deliberations, you must presume that if the accused is sentenced to life imprisonment, he will spend the rest of his life in prison. You are also to presume that if you sentence the defendant to death, he will be subjected to electrocution."
The trial court's refusal to give this instruction was not error. Martin v. State, 548 So.2d 488, 493-94 (Ala.Crim.App.1988), affd 548 So.2d 496 (Ala.1989), cert, denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 461 So.2d 834, 847 (Ala.Crim.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984), followed in Morrison v. State, 500 So.2d 36, 47-48 (Ala.Crim. App.1985), affd, 500 So.2d 57 (Ala.1986), cert, denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).

*901 B
Slaton also asked that the following instruction be given to the jury:
"Whatever your sentence in this case death by electrocution or life imprisonment without possibility of parolethe responsibility for making this decision rests with you."
Again, the trial court's refusal to give the requested charge was not error. The requested instruction was not a correct statement of the law, in that the trial court, not the jury, has the ultimate responsibility for deciding whether the defendant is sentenced to life in prison without parole or death. Freeman v. State, 555 So.2d 196 (Ala.Crim. App.1988), affd, 555 So.2d 215 (Ala.1989), cert, denied, 496 U.S. 912,110 S.Ct. 2604,110 L.Ed.2d 284 (1990). See, also, § 13A-5-47, Code of Alabama 1975. Because the requested charge contained an incorrect statement of the law, the charge was properly refused.

C
Slaton also argues that the trial court erred by apologizing to the jury for "its lengthy charge" during both the guilt phase and penalty phase of the trial. (Appellant's brief at 90.) The apology, he says, suggested to the jury that the charges were "merely a formality" and that they need not be taken seriously. Slaton's argument is without merit.
The trial court began its charge to the jury during the guilt phase of the trial as follows:
"All right, ladies and gentlemen, it is at this point in the trial that the court will attempt to define the law to you applicable to the facts of the case. In view of the fact that I must be very careful and charge you as correctly as possible, it will be necessary I read most of these charges. I apologize for that at this time; however, it is, as I say, I must be very careful in charging you as correctly as possible."
At the sentencing phase of the trial, the court instructed the jury:
"It is my duty again to instruct you or charge you as to the law, and as I told you yesterday, in view of the fact that I must be very careful in these charges, it will be necessary that I read most of them to you as we go along in the charge concerning the law."
We reject Slaton's argument that those instructions somehow made the jury take its responsibility less seriously. The judge's apology served to emphasize to jurors the importance of the charges about to be read to them, and also impressed upon them that the charges were not to be taken lightly. The trial court did not err in apologizing to jurors before instructing them on the law in this case.

XVIII
Slaton also contends that during the sentencing phase of the trial, the trial court erred in instructing the jury that each juror must vote for either life in prison without parole or death. Slaton also claims that the verdict forms forced jurors to vote for either life in prison without parole or death; the form did not allow jurors to remain undecided.
The jury was instructed as follows:
"In order to bring back a verdict recommending the punishment of death, at least ten of your number must vote for death. In other words, a verdict of death must be either unanimous or eleven for death and one for life without parole, or ten for death and two for life without parole. Any number less than ten cannot recommend the death penalty.
"In order to bring back a verdict recommending a sentence of life imprisonment without parole, there must be a concurrence of at least seven of your number for that sentence. In other words, in order for a verdict to be returned recommending imprisonment or life without parole, it must either be unanimous, eleven for life without parole, one for death, or down to seven for life without parole and five for death. Any number less than seven cannot recommend life without parole."
Slaton contends that the instruction that each juror must vote for either life in prison without parole or death resulted in an unreliable death sentence.
*902 At trial, Slaton did not object to the instruction that he now questions; therefore, we must review the instruction for plain error. The trial court's instruction on this issue was substantially identical to the Alabama Pattern Jury Instructions adopted by the Alabama Supreme Court. "This court will not hold that the trial court plainly erred when the jury was instructed pursuant to those pattern jury instructions." Dill v. State, 600 So.2d 343, 361 (Ala.Crim.App. 1991), affd, 600 So.2d 372 (Ala.1992), cert, denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), affd, 577 So.2d 531 (Ala.1991), cert, denied 502 U.S. 886, 112 S.Ct. 242, 116, L.Ed.2d 197 (1991). Additionally, the jury charge at issue is a correct statement of the law. There are only two possible punishments for one a defendant who has been convicted of capital murderlife in prison without parole or death. § 13A-5-39, Code of Alabama 1975. In order to bring back a verdict in this case, jurors would have to vote for either life in prison without parole or death, as the trial court instructed. Thus the trial court did not err in giving the challenged instruction.

XIX
Slaton also contends that the trial court's instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance was defective, and that the evidence of that aggravating circumstance was insufficient as a matter of law. He says the instruction is defective in three ways: (1) the jury could have found that the especially heinous, atrocious, or cruel aggravating circumstance existed even without finding that the murder was unnecessarily torturous as required by Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981); (2) the instructions allowed the jury to find that the heinous, atrocious, or cruel aggravating circumstance existed without finding that Slaton's personal actions were unnecessarily torturous; and (3) the instructions allowed different jurors to agree on the existence of the especially heinous, atrocious, or cruel aggravating circumstance based on differing findings in violation of the requirement that aggravating circumstances be found unanimously before being considered.
According to the record, the trial court instructed the jury on the especially heinous, atrocious, or cruel aggravating circumstance as follows:
"The second aggravating circumstances is the capital offense was especially heinous, atrocious or cruel compared to other capital offenses. The term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance is only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous, atrocious, or cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim.
"All capital cases are heinous, atrocious, or cruel to some extent, but not all capital offenses are especially heinous, atrocious, or cruel compared to other capital offenses.
"You should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a conscienceless or pitiless crime which was unnecessarily torturous to the victim."

A
Slaton's argument that the instruction allowed the jury to find the existence of the especially heinous, atrocious, or cruel aggravating circumstance even without finding that the murder was unnecessarily torturous is without merit. In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), the Alabama Supreme Court held that for a capital offense to be "especially heinous, atrocious or cruel, that offense had to be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" In his brief to this court, Slaton argues that the jury charge made the "unnecessarily torturous" requirement merely one of several factors *903 on which the jurors could base a finding of the heinous, atrocious, or cruel aggravating circumstance as set out in § 13A-5-49(8), Code of Alabama 1975, but was not necessary for proof of that circumstance. That argument, however, ignores the charge actually given to the jury. The trial court specifically instructed jurors that they "should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a conscienceless or pitiless crime which was unnecessarily torturous to the victim." Clearly, this instruction meets the Kyzer standard.
Furthermore, the instructions read by the trial court in this case are essentially the same as the instructions given to the juries in another case that raised this issue, and which were approved by the appellate courts of this state. Ex parte Bankhead, 585 So.2d 112, 124 (Ala.1991).

B
Slaton also argues that the jury instructions were defective because, he says, they allowed the jury to find that the heinous, atrocious or cruel aggravating circumstance existed without also finding that Slaton's personal actions were unnecessarily torturous. This argument, too, is without merit. In his brief to this court, Slaton argues that the jury was not asked to consider Slaton's own criminal actions, but was asked to focus on the offense itself. The evidence is undisputed that Slaton acted alone, therefore, his own criminal actions are tantamount to the offense itself and no error could have occurred by asking the jury to consider the offense rather than Slaton's actions.
Furthermore, as the Supreme Court said in Bankhead:
"In § 13A-5-49(8), the emphasis is on the manner of the killing, not on the defendant's actual participation. In the sentencing phase of a bifurcated trial under § 13A-5-43, the jury has already determined that the crime is a capital offense. That is, the jury has determined that the killing was intentional, because an intentional killing is a necessary element of capital murder. The State does not have to prove that the defendant inflicted the wounds or assign any particular wound to the defendant."
Ex parte Bankhead, 585 So.2d at 125. Therefore, the jury need not be instructed that it must look at the appellant's own actions rather than the offense as a whole when determining whether this capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses.

C
Slaton also claims in a footnote in his brief that the "trial court's literal reading of § 13A-5-49(8)'s disjunctive phrasing" allowed jurors to agree on the existence of the especially heinous, atrocious, or cruel aggravating circumstance based on differing findings and understandings in violation of the requirement that aggravating circumstances be found unanimously before being considered." However, we hold that the trial court properly charged the jury that "[a]ny finding that an aggravating circumstance has been proven beyond a reasonable doubt must be unanimous." See Johnson v. State, 620 So.2d 679, 708 (Ala.Crim.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).

D
Slaton also contends that the evidence in the case was insufficient to support a finding that the victim's murder was especially heinous, atrocious, or cruel. As discussed above, to find that a capital murder is especially heinous, atrocious or cruel, when compared to other capital offenses, the jury must find that the crime was unnecessarily torturous to the victim. In this case, the evidence tended to show that while the victim, Mrs. Phillips, was in her own home, she was raped, beaten severely about the head, strangledbut not to the point of death, and then shot in the chest. The pathologist who performed the autopsy on Mrs. Phillips, Dr. Embry, testified that Mrs. Phillips bled to death several minutes after she was shot. This evidence established that Mrs. Phillips suffered before her death, and, therefore, supported a finding that this capital offense *904 was especially heinous, atrocious, or cruel, compared with other capital offenses.
For the reasons stated above, we hold that the trial court correctly instructed the jury on the law regarding the heinous, atrocious, or cruel aggravating circumstance and that the evidence was sufficient to support a finding that that aggravating circumstance existed in this case.

XX
Slaton next contends that the juvenile court's transfer hearing failed to follow the procedures set out in Rule 24, Ala. R.Juv.P. Specifically, he claims, the juvenile court failed to explain to him his rights during the proceedings, the substance of the petition, and the court's alternatives should the allegations against him be proved.
Rule 24, Ala.R.Juv.P., reads in pertinent part:
"The court shall open the hearing by ascertaining if all necessary parties are present and ready to proceed, and should so note on the record.
"The court shall then explain to the parties their rights during the proceedings, the substance of the petition and the specific allegations contained in said petition. The court shall also explain to the parties the nature of the proceedings and the alternatives available to the court should the allegations contained in the petition be admitted or proven."
Our review of the record in this case shows that the juvenile court followed Rule 24. The court first identified the parties present at the hearing, including the prosecutors, defense counsel, the defendant, witnesses, the court's bailiff, and the victim's family members. The court asked whether Slaton's counsel had talked with Slaton and ascertained that counsel believed Slaton understood the nature of the hearing. The court then described the nature of the hearings and said he would have to consider six factors in determining whether a crime had been committed and whether there was probable cause that Slaton had committed that crime. The court also told Slaton what alternatives were open to the court and what those alternatives would mean to Slaton. Therefore, from the record, we hold that the juvenile court complied with the requirements of Rule 24, Ala.R. Juv.P.
Furthermore, at the close of the court's explanation of the proceedings, Slaton's counsel said he believed the explanation was "fine," and raised no objections. Therefore, even if the trial court had not complied with Rule 24, no reversal is automatically required where there is no objection and the alleged error has not been preserved for review. Shedd v. State, 505 So.2d 1306 (Ala. Crim.App.1987).

XXI
Slaton argues that the trial court did not advise him of the benefits of youthful offender status. In his brief, Slaton argues that he was not apprised of the benefits of youthful offender status, and directs this court's attention to Slaton's transfer hearing in juvenile court. Youthful offender status, however, is granted in circuit court, after the juvenile has been transferred from juvenile court. See § 15-19-1, Code of Alabama 1975.
The record shows that before Slaton was arraigned in circuit court, the circuit judge discussed youthful offender status with him. The record further shows that Slaton did not want to waive his right to trial by jury, which he would have been required to do if he were granted youthful offender status. § 15-19-1, Code of Alabama 1975. Slaton also chose not to consent to the investigation and examination by the court, which also is required before a defendant can be granted youthful offender status, because he might have had to reveal incriminating facts that could be used against him at trial if youthful offender status was denied. § 15-19-1, Code of Alabama 1975. The record does not support Slaton's contention that the trial court did not discuss the benefits of youthful offender status with him, and no error occurred on this issue.

XXII
Slaton also claims that during the guilt phase of his trial, evidence of the victim's *905 personal characteristics was improperly admitted. Slaton also contends that the prosecutor made comments regarding the victim's family during his guilt phase arguments, thus depriving Slaton of a fair trial.
At trial, Slaton did not object to the testimony or arguments regarding the victim; therefore, this court must review this issue under the plain error doctrine. While Slaton's failure to object at trial does not preclude our review of this issue, it does weigh against him as to any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990), affd, 577 So.2d 531 (Ala.), cert, denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
During the guilt phase of the trial, the victim's daughter testified that she had discovered her mother's body and to her shock at her discovery because her mother had been in good health; that her mother had been a very active person who enjoyed crafts and flowers; that her mother was a good housekeeper; that a month before her mother's death, her mother had had surgery on her vocal cords and was almost unable to speak or to use a telephone. Another witness also testified that the victim was having trouble speaking, saying she "had laryngitis or something." This evidence of the victim's personal characteristics was irrelevant to any of the issues in the case, Slaton says, and served only to inflame the jury, thus depriving Slaton of a fair trial.
However, a review of the record shows the questioned evidence was relevant to this case. There was evidence that the home had been ransacked, and Slaton said in his statement that it was that way when he got there. Mrs. Phillips's daughter's testimony that her mother was a good housekeeper would rebut his contention. Additionally, Slaton's contention was that Mrs. Phillips "screamed" at him. Testimony that Mrs. Phillips had had throat surgery and was almost unable to speak would rebut that contention.
Slaton also argues that during both the district attorney's opening statement and closing argument, the prosecutor "directed the jury's attention to the victim's family, suggesting each time that a guilty verdict be returned." Specifically, Slaton now objects to three comments made by the prosecutor. During opening statements of the guilt phase, the prosecutor said:
"But I think all of you as citizens of Marshall County recognize the importance, the significance of the job that you have. You know what's at stake in this case. You know that it's an important case. It's not just important from the standpoint of the State of Alabama, but it's important from the standpoint of the defendant. It's important from the standpoint of the family of Mrs. Phillips."
At the beginning of his guilt phase closing argument, the district attorney told the jury:
"May it please the Court, ladies and gentlemen, I'd like to begin by saying on behalf of Mr. Jolley and myself again to you that we appreciate you being here, to say thank you to you on behalf of the family of Mrs. Phillips, who has been here throughout the trial, we say thank you to you."
The district attorney ended his closing argument as follows:
"The State humbly on behalf of the family in this case and the citizens of this county and state ask you to return a verdict of guilty against Nathan Slaton for the capital offense of murder while committing a rape."
Those comments, Slaton says, could be interpreted by a reasonable juror as an appeal to convict Slaton because the victim's family was suffering. The comments, he adds, could have influenced the jury in reaching its guilty verdict, and he argues that, therefore, his conviction should be reversed. Slaton's claims are without merit.
Slaton first argues that Mrs. Phillips's daughter's testimony and the district attorney's comments violated his federal constitutional rights. He cites Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), in support of this contention, arguing that Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), did not completely overrule those cases and both still apply in his case. The Supreme Court said *906 that Payne overruled Booth and Gathers to the extent that evidence and argument relating to the victim and the impact of the victim's death on family members is now admissible at the sentencing phase of a capital murder trial. The Supreme Court also said that Booth's holding that the admission of the victim's family's characterizations and opinions about the crime, the defendant and the appropriate sentence violates the Eighth Amendment still stands. Slaton argues that Booth and Gathers still are applicable to evidence admitted during the guilt phase of the trial, and evidence and arguments regarding the victim's character at the guilt phase are irrelevant to whether the defendant committed the offense for which he is on trial.
As discussed above, the challenged testimony elicited from the victim's daughter clearly is relevant to a determination of Slaton's guilt or innocence. Moreover, in her testimony, the victim's daughter never made characterizations or gave opinions regarding the crime, the defendant, or the sentence she thought was appropriate in this case. Her testimony was not prejudicial and did not violate Slaton's constitutional rights.
The district attorney's comments during the opening statement and closing arguments merely thanked the jury for its service on behalf of the family, and pointed out the importance of this case to the family. This court has held that there is nothing wrong with introducing family members to the jury, nor is it reversible error when the prosecutor briefly suggests that he is speaking on behalf of the victim's family. Henderson v. State, 583 So.2d 276, 286 (Ala. Crim.App.1990), affd 583 So.2d 305 (1991), cert, denied, 503 U.S. 908,112 S.Ct. 1268,117 L.Ed.2d 496 (1992). The prosecutor's statements in this case were not prejudicial to Slaton and did not constitute reversible error.
Slaton also claims that evidence of the victim's character should not have been admitted because evidence of a victim's good character cannot be admitted unless the defendant first relied on the bad character of the victim. Our review of the record finds that no evidence of the victim's character was introduced, nor did the prosecutor argue her character to the jury. The testimony regarding the victim was relevant to the issues at hand, and the prosecutor's comments that he was speaking on behalf of the victim's family were not inflammatory. No error was committed by allowing testimony regarding the victim, nor was any error committed in the prosecutor's opening statement or closing argument during the guilt phase of the trial.

XXIII
Slaton also argues that the trial court erred in failing to consider nonstatutory mitigating circumstances in sentencing him to death, in violation of § 13A-5-47, Code of Alabama 1975.
§ 13A-5-47 provides in pertinent part:
"(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52."
§ 13A-5-52 provides:
"In addition to the mitigating circumstances specified in § 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
In his sentencing order, the trial judge properly included his findings as to the existence of each of the statutory aggravating and mitigating circumstances. He then wrote:
"In addition to the mitigating circumstances specified in § 13A-5-51, the Court has considered all aspects of the defendant's character of record and the circumstances *907 of the offense which the defendant has offered as a basis for a sentence of life imprisonment without parole instead of death. The Court finds that the defendant's background and family history has certain mitigating aspects. These have been considered."
Slaton maintains that, because the trial court did not identify what those "certain mitigating aspects" were, his death sentence must be remanded for the trial court to consider all mitigating circumstances and to state which mitigating aspects of Slaton's background and family history were considered in determining Slaton's sentence.
The purpose in having the trial court issue written findings regarding aggravating and mitigating circumstances is to provide the basis for review of the death sentence by appellate courts. Whisenhant v. State, 482 So.2d 1225, 1239 (Ala.Crim.App.1982), affd in part and remanded with directions, 482 So.2d 1241 (Ala.1985). In Ex parte Hart, 612 So.2d 536, 541-42 (Ala.1992), 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), the trial court set out in its sentencing order its findings as to each of the mitigating circumstances, then stated, "The court finds no nonstatutory mitigating circumstances."
The Alabama Supreme Court affirmed, citing Cochran v. State, 500 So.2d 1161, 1176 (Ala. Crim.App.1984), rev'd and remanded on other grounds, 500 So.2d 1179 (Ala.1985), on remand 500 So.2d 1188 (Ala.Crim.App.), affd 500 So.2d 1064 (Ala.1986), cert, denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987):
"It is not required that evidence submitted by the accused as a nonstatutory mitigating circumstance be weighed as a mitigating circumstance by the trial judge. Mikenas v. State, 407 So.2d 892, 893 (Fla. 1981), cert, denied, 456 U.S. 1011,102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).
"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rest with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979).' Smith v. State, 407 So.2d 894, 901 (Fla.1981), cert, denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982)."
Ex parte Hart, 612 So.2d at 542. The Supreme Court then said that after reviewing the record and the sentencing order, "we find it clear that the trial court understood its duty to consider all the statutory and nonstatutory mitigating circumstances in sentencing the defendant and that it did not abuse its discretion in finding that no nonstatutory mitigating circumstances existed." Ex parte Hart, 612 So.2d at 542; see, also, Carroll v. State, 599 So.2d 1253, 1273 (Ala. Crim.App.1992), affd, 627 So.2d 874 (Ala. 1993), cert, denied, 510 U.S. 1171, 114 S.Ct. 1207,127 L.Ed.2d 554 (1994).
In this case, too, it is clear that the trial court understood its duty to consider all the statutory and nonstatutory mitigating circumstances. The trial court set out each of the statutory aggravating and mitigating circumstances, and said whether it found those circumstances to exist. The trial court stated that aside from the statutory mitigating circumstances, it was also considering Slaton's background and family history in mitigation of the death penalty. The trial court then said in its order that after weighing the aggravating and mitigating circumstances, it found the aggravating circumstances outweighed the mitigating circumstances, and a sentence of death was warranted. There is no doubt that the trial court considered mitigating circumstances, and the sentencing order clearly sets out which mitigating circumstancesboth statutory and nonstatutorywere considered and weighed against the aggravating circumstances. The court need not set out in its sentencing order each and every nonstatutory mitigating circumstance offered by the defendant; it merely needs to set out whether he found any nonstatutory mitigating circumstances, and if so, what those were. Our review of the aggravating and mitigating circumstances in this case shows that the trial court did not abuse its discretion in determining that Slaton's background and family history were nonstatutory mitigating *908 circumstances, but that the aggravating circumstances still outweighed the mitigating circumstances. No error exists on this issue.

XXIV
Slaton maintains that the $1,000 cap placed on the fees his court-appointed attorneys could receive for out-of-court work on his case is unconstitutional. He claims that the limitation is an unconstitutional taking of defense counsel's property and deprives the defendant of the effective assistance of counsel. These claims have been addressed and rejected in Ex parte Grayson, 479 So.2d 76, 79-80 (Ala.1985), cert, denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), and in Smith v. State, 581 So.2d 497 (Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991). See, also, Johnson v. State, 620 So.2d 679, 708 (Ala.Crim.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), cert, denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).

XXV
Slaton also contends that the trial court erred in considering juvenile convictions to find that he had a significant history of prior criminal activity, thus improperly eliminating one of the mitigating circumstances specified in § 13A-5-51(1), Code of Alabama 1975. On original submission, we agreed with Slaton and we remanded the issue to the trial court for a determination of whether the death sentence would have been imposed without consideration of Slaton's juvenile record.
On return to remand, the trial court said in its written findings:
"[I]t is apparent that the undersigned trial judge did not state correctly, in the sentencing order, the first factor of the mitigating circumstances, i.e. whether the defendant had a significant history of prior criminal activity, which in this matter is obviously in the negative. Conversely the trial court did state `that the defendant does have a significant juvenile record;' however, it was noted by the court, although unstated, that the presentence report was based on hearsay information of a juvenile record of arrests, not convictions. The circumstances of this offense: murder during the rape of an elderly woman, and the unanimous recommendation of the jury that the death sentence be imposed would have been sufficient for the court to sentence the appellant to death without consideration of his juvenile record."
The trial court has fully complied with this court's remand order and determined that even without consideration of Slaton's juvenile record, Slaton still would have been sentenced to death based on the aggravating circumstance in this case and in consideration of the jury's recommendation of death.
We have searched the entire record for any plain error or defect that might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala. R.App.P. Slaton received a fair and impartial trial. For the reasons stated above, Slaton's conviction and sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.

ON APPLICATION FOR REHEARING
COBB, Judge.
This court, in its opinion released January 13, 1995, failed to include a review of the propriety of the appellant's sentence as is required by § 13A-5-53, Code of Alabama 1975. Therefore, our opinion of January 13, 1995, is extended to include a review of the appellant's sentence of death.
We have reviewed the trial court's findings concerning the aggravating and mitigating circumstances in this case. The trial court found one aggravating circumstances: that the capital offense was committed while the defendant was engaged in the commission of a rape. The trial court considered each of the statutory mitigating circumstances set out in § 13A-5-51, Code of Alabama 1975, and it considered such non statutory mitigating evidence as the appellant's previous mental health problems and his family history.
*909 Our review of the record leads us to conclude that the trial court's findings concerning the aggravating and mitigation circumstances are supported by the record. We find no evidence that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances convinces us that death is the appropriate and proper sentence in this case.
Furthermore, the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See Barbour v. State, 673 So.2d 461 (Ala.Crim.App. 1994); Bradley v. State, 494 So.2d 750 Ala.Crim. App.1985), affd, 494 So.2d 772 (1986), cert, denied, Williams v. Ohio, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987).
Pursuant to Rule 45A, Ala.R.App.P., we have thoroughly reviewed the record in this case, and we find no error that adversely affected this appellant's rights during the guilt phase or the sentencing phase of this trial. The appellant's convictions for this capital offense and his sentence of death are proper.
APPELLEE'S APPLICATION GRANED; APPELLANT'S APPLICATION DNIED; OPINION EXTENDED; AFIRMED.
All the Judges concur.